IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EMMANUEL E. SEWELL          *

   Plaintiff             *

      v               *      Civil Action No. DKC-18-3439

DAYENA CORCORAN,            *
LAURA Y. ARMSTEAD,
RANDALL NERO,               *
DR. TEMERIKA BUCANNON,
DR. HAIGHT,                 *
DR. ALLEN,
BEZAWIT ADDIS,              *

   Defendants            *

**MEMORANDUM OPINION**

This court issued an Order to Show Cause following the receipt of Plaintiff Emmanuel Sewell's Status Report (ECF No. 7) indicating that he has been subjected to assaults by other inmates and that correctional staff are allowing other inmates to steal his legal materials from his cell. Prior to the receipt of counsel's response, Mr. Sewell filed a "motion for intervention/urgent circumstances" asserting the same or similar matters raised in the Status Report. ECF No. 14. The response to the court's show cause addresses those allegations and seeks denial of injunctive relief in favor of Sewell. ECF No. 16. In both papers, Mr. Sewell requests both the appointment of counsel and injunctive relief. For the reasons stated herein, Mr. Sewell's requests will be denied.

Mr. Sewell claims that on November 29, 2018, as he was leaving the nurse's station, inmate Royston Green was blocking the door with his hands behind his back. ECF No. 7-1 at p. 1. When Mr. Sewell attempted to move past Mr. Green, he claims that Mr. Green moved his hands from behind his back and began throwing punches at Mr. Sewell. *Id*. When Mr. Sewell "side stepped" Mr. Green, he claims that Mr. Green punched him in the left leg. *Id*. Mr. Sewell told Officer J. McLeisch, whom he claims was present, that Green should be restrained. *Id*. In response, Officer

McLeisch allegedly simply smiled at Mr. Sewell and walked into the nurse's station. *Id*. In addition to Officer McLeisch, Mr. Sewell claims that Officer McClary and RN Chuma were "no more than 10 feet away talking" but acted as if nothing happened. *Id*. Although Mr. Sewell encountered Ms. Griffin, the morning activities coordinator, on his way back to his housing tier, he did not report the assault because he "began to panic and realize [he] was being set-up." *Id*. at pp. 1-2. Mr. Sewell opted to simply walk back to his cell instead. *Id*. at p. 2.

The following day Mr. Sewell asked Nurse Chuma why he didn't report what had happened between Mr. Sewell and Mr. Green the day before. ECF No. 7-1 at p. 2. Mr. Sewell claims that Mr. Chuma told him he had not seen anything. *Id*. In Mr. Sewell's estimation it would have been impossible for Mr. Chuma not to hear the sound of Mr. Green's punch to Sewell's leg. *Id*.

During his conversation with Mr. Chuma, Dr. Hong, a psychiatrist, and five other nurses were present. *Id*. Mr. Sewell asked for an investigation into the attack while correctional officers and a nurse were present. *Id*. Mr. Sewell states he has met with Dr. Hong twice since asking for an investigation and has been informed that "Intel is notified" about legal documents being stolen; personal mail being stolen; Officers Bell and Wandue allowing inmates E. Washington, J. Stepney, and M. Walker into his cell when Mr. Sewell is in the dining room eating; and death threats from population inmates. *Id*. Despite that assurance, Mr. Sewell states he has not met with an investigator. *Id*.

Mr. Sewell further claims that hours before the assault by Mr. Green, he had a conversation with "Ms. Honchar, Psy. Assoc." about death threats he had received and the practice of letting other inmates into his cell when he is not on the tier. *Id*. Mr. Sewell claims that an inmate maintenance worker who came onto the tier told him, "the only reason you still alive is because of being in mental health, if you were in g-pop you be dead already!" and threats from inmates A. Hubbard and E. Washington that "we are going to make you get new charges whether you like it

or not." *Id*. After sharing this information with Ms. Honchar, Mr. Sewell claims he watched her share the confidential information with Officer McLeisch "and unknowns." *Id*. Mr. Sewell observes that three hours later he was attacked by Mr. Green. *Id*.

In the status report, Mr. Sewell claims that from December 1 through 16,[1] 2018, he received defective medical devices for diabetic finger sticks that turned his fingers purple and blue. *Id*. He claims that the puncture wounds in his fingers stopped healing and he stopped "taking it" from December 12 through 16 "because [he] was waking-up in a cold sweats." *Id*. Mr. Sewell reported to "Ms. Kuntra who has been filling in for Dr. Hong" that the nurses told him to stop looking at his fingers. *Id*. He maintains that there are inmates who are gang members that are "behind it: M. Walker, N. Carter, J. Stepney, and E. Washington." *Id*. He implies that "RN Glenn who has suddenly disappeared" is also somehow responsible. *Id*.

Mr. Sewell claims that on January 10, 2019, Officer J. McLeisch put Mr. Sewell in harm's way when he brought an administrative segregation inmate to the nurse's station where Mr. Sewell was waiting for treatment. ECF No. 7-1 at p. 3. Mr. Sewell states that nothing happened because two other inmates, whom he does not name, were with him. *Id*. Three days later, Mr. Sewell states that Officer Herring was escorting the same inmate, but he was restrained. *Id*.

Attached to Mr. Sewell's motion for intervention is his letter to Warden Armstead stating that random correctional officers and "mental health inmates" are stalking him anytime he leaves the tier for meals, takes his mail to the box for outgoing mail, or tries to use the phone. ECF No. 14-1 at p. 1. He also claims that unnamed sergeants are interfering with his outgoing legal and personal mail and that there is a lack of meaningful psychological services available to him. *Id*.

---

[1]  Mr. Sewell claims in his motion that this occurred from December 7 through 18, 2018. ECF No. 14-3 at p. 2.

He explains that on December 14, 2018, he sent an envelope to his family that contained three Christmas cards, a letter, an ARP referral to Secretary Moyer's office, an ARP appeal to the Commissioner of Correction, and an IGO complaint concerning his claim of "poisoning from Risperdal." *Id*. He states that two months passed and he got no response. *Id*. Mr. Sewell also states that none of the medical or correctional staff he approached for assistance helped him with his complaints regarding harassment and outgoing mail. *Id*. at p. 2.

In a letter dated December 19, 2018, addressed to Russell Nero, Director of Patuxent Institution, he explains that he is confined to the mental health unit and the conditions of his confinement are under scrutiny by the undersigned. ECF No. 14-2 at p. 1. Mr. Sewell claims that other inmates are targeting him and others to "set [them] up with nursing staff and officers who show" favor to the other inmates. *Id*. He describes the behavior as inmates "trying to get me to assault them" by misplacing or stealing items from his cell while he is at meals. *Id*. at pp. 1-2. Mr. Sewell requests additional staff to be a "champion for mental health rights" because, in his opinion, existing staff are over-burdened. *Id*.

In a document entitled "Affidavit of Ongoing Controversy," which is also attached to his motion, Mr. Sewell states he is "forcibly held against [his] will" at Patuxent and that his sentence has expired. ECF No. 14-3 at p. 1. He repeats his allegation that he was assaulted by Royston Green, on November 29, 2018, as well as his claim that Officer McLeisch exposed him to potential harm on January 10, 2019. *Id*.

Counsel for the Department of Public Safety and Correctional Services, provides affidavits and verified medical records in their response to show cause establishing, inter alia, that Mr. Sewell was diagnosed with an Axis I Delusional Disorder and Major Depressive Disorder (noted as recurrent and in remission) as of February 26, 2019. ECF No. 16-1 at p. 2. Prior to that date Mr.

4

Sewell's Axis I diagnoses were noted as Major Depressive Disorder and Post Traumatic Stress Disorder. *Id*.

Mr. Sewell was noted as experiencing a recent increase in paranoid thought content on December 26, 2018, when Kaylin Honchar, LGPC, MHP and Mr. Sewell's treatment team met to discuss it. ECF No. 16-2 at p. 71. It was noted that Mr. Sewell had in the past declined to take medication to control the paranoia, but an effort would be made to evaluate him and the offer of medication would be made again. *Id*.

On February 7, 2019, Ms. Honchar's notes regarding an individual therapy session with Mr. Sewell memorialized their discussion about a report from the charge nurse that Mr. Sewell was refusing to attend meals in the dining room because of his belief he had been poisoned. ECF 16-2 at p. 29. Mr. Sewell explained that his belief that he was poisoned was based on the development of ulcers and sores on his tongue about an hour after eating. *Id*. When Ms. Honchar suggested there might be other explanations for it and that it sounded like he was being paranoid, Mr. Sewell refused to accept the suggestion despite the "on and off" issue with paranoia he had experienced during his time in the program. *Id*. In a prior note, Ms. Honchar states that Mr. Sewell "continues to make some progress towards his treatment goals" but "remains at a level 4 due to his paranoia." *Id*. at p. 44.

In Ms. Honchar's monthly note dated February 22, 2019, she describes Mr. Sewell as suffering from paranoid delusions regarding other inmates taking his property and his beliefs that there had been recent attempts to poison him. *Id*. at p. 5. Ms. Honchar notes that there is no evidence to support Mr. Sewell's belief; that he does not believe he has a mental health issue; and he had begun to withdraw from interactions with peers because of his paranoid beliefs. *Id*.

Mr. Sewell's allegation that Officer Joseph McLeish was derelict in his duties when inmate Royston Green allegedly assaulted him is refuted with Officer McLeish's declaration under oath

stating he was assigned to a different housing unit on the date in question. ECF No. 16-2 at ¶3. Further, inmate Mr. Green is housed on a different tier from Mr. Sewell, is a different "level" than Mr. Sewell, and would never have had any access to Mr. Sewell's housing area as claimed. *Id*. With respect to Mr. Sewell's claim that other inmates are allowed to go into his cell while he is at meals, Officer McLeish explains that the inmates on Mr. Sewell's housing unit are locked in their cells unless they are scheduled for any out of cell activities. *Id*. at ¶4. Before Mr. Sewell's tier is released for meals an announcement is made, cell doors are opened, and inmates are instructed to stand outside of their cells if they wish to attend the meal. Once they are standing outside of their cells, the doors are closed and locked before they exit the tier to go to the dining hall, making it impossible for other inmates to enter Mr. Sewell's cell and steal his belongings. *Id*. Finally, Officer McLeish affirms that there are no validated members of a Security Threat Group housed on Mr. Sewell's tier. *Id*. at ¶5.

Officer Cheryl McClary states in her declaration under oath that on November 29, 2018, she was assigned to the monitor the corridor of Mr. Sewell's housing tier which is "the hub area where the different housing tiers intersect" and "the nurse's station is located." ECF No. 16-4 at ¶4. She explains that because inmate Royston Green is a Level I inmate he must be handcuffed and escorted by an officer for all out of cell movement and would never be "scheduled or permitted to be in the corridor at the same time" as a Level IV inmate such as Sewell. *Id*. The doors from the housing tiers to the corridor "remain locked at all times" making it "impossible for inmate Green to be standing at the nurse's station un-cuffed and un-escorted as alleged." *Id*. at ¶5. Officer McClary further states that her duties require her to monitor inmate movement from the corridor entrance which excludes the possibility that she would be at the nurse's station talking to the nurse as claimed by Mr. Sewell. *Id*.

A declaration under oath provided by Officer Nadege Wandue confirms that on Mr. Sewell's housing unit inmates are locked in their cells during the day and "are constantly monitored during any out of cell activity such as meals." ECF No. 16-5 at ¶3. He denies allowing three inmates to go into Mr. Sewell's cell and allowing them to steal Mr. Sewell's property. *Id*. Officer Latisha Bell provides a declaration under oath that mirrors Officer Wandue's statement. ECF No. 16-6.

Correctional Case Management Specialist Curtis Lawson states in his declaration under oath that he met with Mr. Sewell on February 6, 2019, during his scheduled rounds of the mental health unit where Mr. Sewell is housed and Mr. Sewell did not report any issues regarding threats to his safety to Mr. Lawson. ECF No. 16-7 at ¶¶3,4. Mr. Lawson's review of Mr. Sewell's institutional base file revealed no reports by Mr. Sewell of lost or stolen legal mail, assaults, threats by other inmates, or missed transport to court dates. *Id*. at ¶5. Mr. Lawson further reports that inmates Earl Washington, Jarel Stepney, and Maurice Walker are not verified active members of a Security Threat Group and are not listed as enemies on Mr. Sewell's enemy list. *Id*. at ¶6. There is only one named enemy on Mr. Sewell's list and that inmate, Peter Herrera, is not incarcerated at Patuxent. *Id*. Despite Mr. Sewell's filing of the instant lawsuit and request for emergency intervention from this court, Mr. Lawson states that Mr. Sewell has not reported to any prison staff that he has been threatened or assaulted by other inmates. *Id*. at ¶7.

## Injunctive Relief

A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren,* 553 U.S. 674, 689–90 (2008). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Natural Res.*

*Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994).

## Analysis

The record evidence establishes that Mr. Sewell's reports of stolen property and assaults by other inmates cannot be verified through objective, direct, or circumstantial evidence and are likely the result of his legitimate psychiatric disorder that causes paranoid delusions. Additionally, there is also ample evidence that Mr. Sewell is receiving care for his illness. The level of protection provided to Sewell in his current housing assignment appears to be appropriately tailored to insure he is not victimized by other more predatory inmates outside of the mental health unit in which he is now confined. Any additional requirements to insure Mr. Sewell's safety imposed by this court would be an unwarranted intrusion into the management of the correctional institution and involve protection of Mr. Sewell from a speculative, if not imaginary, potential for harm.

In the papers filed with this court Mr. Sewell indicates that he requires the assistance of counsel to move forward with his claims. ECF No. 7; ECF No. 14. A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is a discretionary one, and may be considered where an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982). There is no absolute right to appointment of counsel; an indigent claimant must present "exceptional circumstances." *See Miller v. Simmons*, 814 F.2d 962, 966 (4th Cir. 1987).

Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it." *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds by *Mallard v. U.S. Dist. Ct.*, 490 U.S. 296, 298 (1989) (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel). Exceptional circumstances include a litigant who "is barely able to read or write," *Whisenant* at 162, or clearly "has a colorable claim but lacks the capacity to present it," *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 723 (E.D. Va. 2008).

Upon careful consideration of the motions and previous filings by Mr. Sewell and in light of the fact that he has filed responses in opposition to the pending dispositive motions (ECF Nos. 22 and 27), the court finds that he has demonstrated the wherewithal to either articulate the legal and factual basis of his claims himself or secure meaningful assistance in doing so. No exceptional circumstances currently exist that warrant the appointment of an attorney under § 1915(e)(1). In light of the denial of Mr. Sewell's request for an attorney he will be provided a brief opportunity to supplement his responses in opposition to the pending dispositive motions if he so chooses.

A separate Order denying injunctive relief and appointment of counsel follows.

August 2, 2019 /s/
DEBORAH K. CHASANOW
United States District Judge