IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| EMMANUEL SEWELL | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. DKC-18-3439 |
| DAYENA CORCORAN, | * | |
| LAURA Y. ARMSTEAD, | | |
| RANDALL NERO, | * | |
| DR. TALIBAH BUCHANAN,[1] | | |
| DR. HAIGHT, | * | |
| DR. ALLEN, | | |
| BEZAWIT ADDIS, | * | |
| Defendants | * | |

***

## MEMORANDUM OPINION

Pending in the above-captioned case are motions to dismiss or for summary judgment filed on behalf of Defendants Dayena Corcoran, Laura Armstead, and Randall Nero (ECF No. 20); and Defendant Bezawit Addis (ECF No. 25). Plaintiff Emmanuel Sewell opposes both motions (ECF No. 22, 27). Defendant Dr. Talibah Buchanan filed a motion for judgment as a matter of law (ECF No. 32), Mr. Sewell was provided with notice of the motion and of his right to oppose it (ECF No. 34), but no timely response has been received. No hearing is necessary. *See* Local Rule 105.6 (2018). For the reasons stated below, the court will grant the motions filed on behalf of Defendants Corcoran, Armstead, Nero and Bezawit, which are construed are motions for summary judgment. The motion filed on behalf of Dr. Buchanan is also construed as a motion for summary judgment[2] and will be granted.

---

[1]    The Clerk is directed to correct the spelling of Defendants' names as reflected in this caption.

[2]    Defendant Buchanan's dispositive submission will be treated as a motion for summary judgment under Federal Rule of Civil Procedure 56 because materials outside the original

## **BACKGROUND**

In a Memorandum Opinion and Order dated August 2, 2019, this court determined that in light of Defendants' response to show cause together with the records submitted in support, Mr. Sewell was not entitled to preliminary injunctive relief. ECF No. 28 and 29. Pertinent to the currently pending dispositive motions, this court summarized the evidence provided in opposition to Mr. Sewell's request for injunctive relief as follows:

> Counsel for the Department of Public Safety and Correctional Services, provides affidavits and verified medical records in their response establishing, inter alia, that Mr. Sewell was diagnosed with an Axis I Delusional Disorder and Major Depressive Disorder (noted as recurrent and in remission) as of February 26, 2019. ECF No. 16-1 at p. 2. Prior to that date Mr. Sewell's Axis I diagnoses were noted as Major Depressive Disorder and Post Traumatic Stress Disorder. *Id*.

> Mr. Sewell was noted as experiencing a recent increase in paranoid thought content on December 26, 2018, when Kaylin Honchar, LGPC, MHP and Mr. Sewell's treatment team met to discuss it. ECF No. 16-2 at p. 71. It was noted that Mr. Sewell had in the past declined to take medication to control the paranoia, but an effort would be made to evaluate him and the offer of medication would be made again. *Id*.

> On February 7, 2019, Ms. Honchar's notes regarding an individual therapy session with Mr. Sewell memorialized their discussion about a report from the charge nurse that Mr. Sewell was refusing to attend meals in the dining room because of his belief he had been poisoned. ECF 16-2 at p. 29. Mr. Sewell explained that his belief that he was poisoned was based on the development of ulcers and sores on his tongue about an hour after eating. *Id*. When Ms. Honchar suggested there might be other explanations for it and that it sounded like he was being paranoid, Mr. Sewell refused to accept the suggestion despite the "on and off" issue with paranoia he had experienced during his time in the program. *Id*. In a prior note, Ms. Honchar states that Mr. Sewell "continues to make some progress towards his treatment goals" but "remains at a level 4 due to his paranoia." *Id*. at p. 44.

> In Ms. Honchar's Monthly Note dated February 22, 2019, she describes Mr. Sewell as suffering from paranoid delusions regarding other inmates taking his property and his beliefs there had been recent attempts to poison him. *Id*. at p. 5. Ms. Honchar notes that there is no evidence to support Mr. Sewell's belief; that

---

pleadings (*see* ECF No. 33) have been considered. *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

he does not believe he has a mental health issue; and he had begun to withdraw from interactions with peers because of his paranoid beliefs. *Id.*

Mr. Sewell's allegation that Officer Joseph McLeish was derelict in his duties when inmate Royston Green allegedly assaulted him is refuted with Officer McLeish's declaration under oath stating he was assigned to a different housing unit on the date in question. ECF No. 16-2 at ¶3. Further, inmate Mr. Green is housed on a different tier from Mr. Sewell, is a different "level" than Mr. Sewell, and would never have had any access to Mr. Sewell's housing area as claimed. *Id.* With respect to Mr. Sewell's claim that other inmates are allowed to go into his cell while he is at meals, Officer McLeish explains that the inmates on Mr. Sewell's housing unit are locked in their cells unless they are scheduled for any out of cell activities. *Id.* at ¶4. Before Mr. Sewell's tier is released for meals an announcement is made, cell doors are opened, and inmates are instructed to stand outside of their cells if they wish to attend the meal. Once they are standing outside of their cells, the doors are closed and locked before they exit the tier to go to the dining hall, making it impossible for other inmates to enter Mr. Sewell's cell and steal his belongings. *Id.* Finally, Officer McLeish affirms that there are no validated members of a Security Threat Group housed on Mr. Sewell's tier. *Id.* at ¶5.

Officer Cheryl McClary states in her declaration under oath that on November 29, 2018, she was assigned to the monitor the corridor of Mr. Sewell's housing tier which is "the hub area where the different housing tiers intersect" and "the nurse's station is located." ECF No. 16-4 at ¶4. She explains that because inmate Royston Green is a Level I inmate he must be handcuffed and escorted by an officer for all out of cell movement and would never be "scheduled or permitted to be in the corridor at the same time" as a Level IV inmate such as Sewell. *Id.* The doors from the housing tiers to the corridor "remain locked at all times" making it "impossible for inmate Green to be standing at the nurse's station un-cuffed and un-escorted as alleged." *Id.* at ¶5. Officer McClary further states that her duties require her to monitor inmate movement from the corridor entrance which excludes the possibility that she would be at the nurse's station talking to the nurse as claimed by Mr. Sewell. *Id.*

A declaration under oath provided by Officer Nadege Wandue confirms that on Mr. Sewell's housing unit inmates are locked in their cells during the day and "are constantly monitored during any out of cell activity such as meals." ECF No. 16-5 at ¶3. He denies allowing three inmates to go into Mr. Sewell's cell and allowing them to steal Mr. Sewell's property. *Id.* Officer Latisha Bell provides a declaration under oath that mirrors Officer Wandue's statement. ECF No. 16-6.

Correctional Case Management Specialist Curtis Lawson states in his declaration under oath that he met with Mr. Sewell on February 6, 2019, during his scheduled rounds of the mental health unit where Mr. Sewell is housed and Mr. Sewell did not report any issues regarding threats to his safety to Mr. Lawson. ECF 16-7 at ¶¶3,4. Mr. Lawson's review of Mr. Sewell's institutional

3

base file revealed no reports by Mr. Sewell of lost or stolen legal mail, assaults, threats by other inmates, or missed transport to court dates. *Id*. at ¶5. Mr. Lawson further reports that inmates Earl Washington, Jarel Stepney, and Maurice Walker are not verified active members of a Security Threat Group and are not listed as enemies on Mr. Sewell's enemy list. *Id*. at ¶6. There is only one named enemy on Mr. Sewell's list and that inmate, Peter Herrera, is not incarcerated at Patuxent. *Id*. Despite Mr. Sewell's filing of the instant lawsuit and request for emergency intervention from this court, Mr. Lawson states that Mr. Sewell has not reported to any prison staff that he has been threatened or assaulted by other inmates. *Id*. at ¶7.

ECF No. 28 at 4-7. This court noted that Mr. Sewell was currently receiving adequate care for his illness and that "[t]he level of protection provided to [Mr.] Sewell in his current housing assignment appears to be appropriately tailored to insure he is not victimized by other more predatory inmates outside of the mental health unit in which he is now confined." *Id*. at 8. Against the backdrop of the court's analysis, Mr. Sewell's Fourteenth and Eighth Amendment claims are summarized[3] below.

**Complaint Allegations**

1.     Due Process Claims:

Mr. Sewell claims that he has been denied due process because correctional staff refuse to follow policy. ECF No. 1 at 2. He explains that policies in the "Handbook" are not followed and are outdated and, as a result, Director Nero is neglecting the mental health of patients and allowing correctional staff to give their personal mail to other inmates. *Id*. at 4. In his "declaration" and exhibits, Mr. Sewell includes a request for administrative remedy procedure ("ARP") dated June 17, 2018, directed to the Commissioner of Correction complaining about not being allowed to exhaust administrative remedies. ECF No. 1-1 at 41-42.

---

[3]     Mr. Sewell's complaint contains numerous allegations, some expressed as seemingly incomplete thoughts and others are detailed in copies of institutional administrative remedy procedure forms attached as exhibits. ECF No. 1.

He states in the ARP that Warden Armstead and ARP Coordinator A. Shields were instructed to process his ARP by the Commissioner's office, but the delay tactics employed have "substantially prejudiced [him] because specific officers K. Curtis, A. Alston, Martin, Herring, S. Sampson and unknowns are not only stealing mail-federal instruments, making verbal threats; influencing Patx kitchen, N4 PM corridor worker, and inmates around me where ever I go and to taint food trays given to me. I've suffered left ear drum pains and infections, as I did at RCI Hagerstown." *Id*. at 41. He includes a complaint that P.A. Wilson treated his ear pain with Prolixin[4] and an infection with Amoxicillin,[5] but does not explain how that treatment harmed him. *Id*. at 42. He continues by alleging that "[t]here is a practice where gang members and Muslims use a combination of HIV, psyche, & unknown meds to cause multiple effects of pain/suffer." *Id*. The ARP was dismissed on July 23, 2018, "for procedural reasons" based on Mr. Sewell's failure to resubmit the ARP "in accordance w[ith] the A[dministrative] R[emedies] C[oordinator] instructions." *Id*. at 41, citing COMAR 12.02.28.11(A)(2)(c)(ii).

Mr. Sewell claims that "[t]here are predator inmates being allowed to con and manipulate corr[ectional] staff and psychology where we have no-one to tend to our needs because of no staff." ECF No. 1 at 4. He asserts that when he files ARP complaints there are no signatures that appear on his appeal and no corrective measures are taken against officers, nurses, the warden or the director for the claims he asserts. *Id*. He asks, "[w]hen Dept. of Corr. Of MD provide a policy to be followed by its inmates & employees: is it a violation of the due process clause when they fail to adhere to their own rules?" *Id*.

---

[4]    Prolixin or Fluphenazine is used to treat symptoms of a certain types of mental or mood conditions. Continued use of this medication reduces episodes of hallucinations, delusions, or bizarre behaviors. *See* https://www.webmd.com/drugs/2/drug-6222-3224/prolixin-oral/fluphenazine-oral/details (last viewed Jan. 17, 2020).

[5]    Amoxicillin is an antibiotic. *See* https://www.webmd.com/drugs/2/drug-1531-3295/amoxicillin-oral/amoxicillin-oral/details (last viewed Jan. 17, 2020).

Mr. Sewell also claims that his release from prison has been thwarted by the interference of people whom he does not name.  ECF No. 1 at 2-3.  He offers that this is due to the fact that he stands "against being extorted by Corr. Staff, Psychology, Muslims, BGF, Murder Inc., DMI, Bloods, Aryan intimidation indirect threats against [him] and family at NBCI, RCI, & Patuxent." *Id*.  He explains that "the disciplinary proceedings that was a result of my revocation of diminution of confinement credits did not comport with Federal due process protections, including the commitment Manual."  *Id*. at 4.  He faults the Secretary of the Department of Public Safety and Correctional Services, the Commissioner of Correction, the Warden, and Director Nero for failing to protect his rights under the First and Eighth Amendments and for exposing him to conditions of confinement that "can be considered by law cruel and unusual punishment."  *Id*.

2.    Mail claims

Mr. Sewell's complaint, as well as the ARP requests he submit as exhibits, repeated alleged claims that his outgoing personal and legal mail has not been delivered to its intended recipient and that his incoming personal and legal mail has been given to other inmates to read.  He seemingly supports this claim by citing instances where other inmates have asked him about the content of his outgoing legal mail or have somehow implied they know something about the content of his mail.  He states that he sent mail to his daughter asking her to contact the Patuxent commitment office about his release, but she did not receive it.  ECF No. 1 at 2.  Mr. Sewell claims that the mail was given to Officer A. Jones on August 9, 2018.  *Id*.  He adds that the ongoing mail tampering "has hindered me for the past 10 years in previous cases: DKC-04-693; DKC-12-2656; DKC-15-3040; and DKC-18-2726" and explains that the court's decision[6] did not include the

---

[6]    Although Mr. Sewell does not clearly delineate which of the court's decisions he is referring to, it appears he is referring to *Sewell v. Corcoran*, Civil Action DKC-18-2726 (D. Md. 2018), which was a Petition for Writ of Habeas Corpus that was summarily dismissed without requiring a response from Commissioner Corcoran or Warden Armstead because the petition did not state a federal claim.  *Id*. at ECF No. 5, p. 1.  Specifically, Mr. Sewell was seeking an order

Commissioner's response or evidence Mr. Sewell provided. *Id.* He claims that the interference with his mail has caused him to be afraid to file in court because medical, legal, and personal mail has been randomly stolen. ECF No. 1 at 4.

3. Medical and Psychological Care claims

Mr. Sewell's claims regarding his medical care center mostly[7] around medications that he has been offered or provided and a generalized claim that there is no proper monitoring of patients and employees. ECF No. 1 at 4. In an ARP complaint attached as an exhibit and dated March 16, 2018, Mr. Sewell complains that medical staff switched pill manufacturers, which caused him to suffer side effects. ECF No. 1-1 at 43. He explains that "the dark green pill was changed to a light green pill" and caused his "urine to begin to bubble up." *Id.* at 44. According to Mr. Sewell, "[t]he standard for the past 13 years I've been tak[ing] aspirin is Ecotrin [which] is '<u>yellow</u>' not two separate shades of green." *Id.* (emphasis in original). He also complains that no attempts "to correct the injuries to my neck and throat from being given the wrong meds" have been made "yet, in the past 9 yrs I've had no diabetic sym[p]toms to even warrant them making such[8] assertions!" *Id.* The response to the ARP indicates it was dismissed for procedural reasons and instructs Mr. Sewell to "resubmit by 4/4/18 and include one clear issue and clear remedy." *Id.* at 43.[9]

---

requiring the State to restore all of the good conduct credits that were revoked as a result of a disciplinary rule violation. *Id.* at 4-5, citing *Gurley v. Superior Court of Mecklenburg Cty.*, 411 F.2d 586, 587 (4th Cir. 1969) (federal courts have no mandamus jurisdiction over State employees).

[7] In the context of his allegation that he is denied due process, Mr. Sewell states that the failure of staff to follow policy has caused "multiple hospitalizations and an increase in PTSD symptoms." ECF No. 1 at 2. Like many of his claims, Mr. Sewell does not explain how a denial of due process has impacted his mental and physical health.

[8] Mr. Sewell does not explain what "assertions" he is referencing, but records submitted by Defendant Buchanan clarify that Mr. Sewell does not believe his Type II diabetes diagnosis. *See* ECF No. 33 at 62, 77 & 83.

[9] This appears to be a frequent disposition on Mr. Sewell's ARPs.

With respect to psychological care, Mr. Sewell asserts that there are not enough staff to provide the services needed and there is no one-on-one therapy or group therapy provided. ECF No. 1 at 4. He faults Director Nero for neglecting the mental health patients at Patuxent and claims this constitutes deliberate indifference to mental health needs. *Id.*

4.    Harassment claims

Mr. Sewell's claims of harassment cover a wide variety of alleged conduct by both correctional officers and other inmates. He claims that the tier officer, E. Smith has "purposely denied me basic human needs to shoes and clothes" and on October 11, 2018 "she gives other inmates passes but refuses me." ECF No. 1 at 4.

In his June 17, 2018 ARP, attached as an exhibit to the complaint, Mr. Sewell alleges that Officers K. Curtis, A. Alston, Martin, Herring, S. Sampson and others who are unknown to him, steal his mail and make verbal threats. ECF No. 1-1 at 41. Mr. Sewell also maintains that the officers are "influencing Patx kitchen, N4 PM corridor worker, and inmates around me where ever I go and to taint food trays given to me. I've suffered left ear drum pains and infections, as I did at RCI Hagerstown." *Id.* The remainder of the ARP includes the following claims:

> On June 15, 2018, Officers A. Alston and Martin mocked him behind his back by holding their ears pretending to be in pain.

> On June 17, 2018, Officer Herring "stalked me once I entered IDR at dinner" Watched him spy on me as he hesitated entering the kitchen side door.

> On April 20, 2018, Officers Martin, Herring, and Alston watched as Sewell put Appeal for Patx 0060-18 in the mailbox and Dietary Manager Roland saw it.

> On April 26, 2018, Officers Konyo and Ms. West watched Sewell put a large legal envelope in the mailbox containing four IGO Appeals.

> While on L4-#3 inmate D. Jones was yelling on the tier asking what was in the appeals, constantly goading/provoking Sewell and inviting Sewell to his cell. When Sewell complained to Nero, Sewell was moved to another unit – no investigation was done.

On June 11, 2018, Capt. ICE refused to sign informal complaint he accepted regarding Sewell's legal mail being opened.

Officer Fatuk gave M1 inmates notes saying "fuck you and your daughter" Officer Sampson had inmate L2 next to Sewell slam books on the floor at 2 and 3 AM to startle Sewell and had an inmate urinate in front of the cell.

Officers Alston and Herring denied Sewell showers, but gave others showers; told inmates to flood the tier next to Sewell; and engaged in "constant harassment with verbal threats.

Officers Amatosa, Esimako and unknowns told Sewell "we don't give a fuck what they decide you still a dead mother fucker!"

ECF No. 1-1 at 42.

As relief, Mr. Sewell seeks unspecified compensatory and punitive damages in addition to preliminary injunctive relief, which this court has already denied. In addition, Mr. Sewell seeks mandatory release, expungement of his criminal and disciplinary records, and "to be provided Federal and State Due process rights protections and any other relief to be granted under Americans with Disabilities Acts[10] Title II-III § § 504-506." ECF No. 1 at 5.

### Defendants' Response

Defendants Commissioner Dayena Corcoran, Warden Laura Armstead, and Director Randall Nero (collectively "Correctional Defendants"), assert in their motion to dismiss or for summary judgment that: Mr. Sewell's claim regarding a 2011 revocation of good conduct credits is time barred (ECF No. 20-1 at 8-9); the complaint fails to satisfy minimal pleading requirements for a cognizable claim (*id*. at 9-11); qualified immunity precludes the claims asserted by Mr. Sewell (*id*. at 11-12); Defendants Armstead and Nero were not personally involved in any alleged wrong-doing (*id*. at 12-14); any alleged violation of Defendants' own rules or policies is not a viable basis for a due process claim (*id*. at 14-15); Defendants did not infringe a constitutionally

---

[10] This is the only reference to the Americans with Disabilities Act made by Mr. Sewell. There are no allegations supporting a claim under the Act; therefore, to the extent this is intended to be a claim it is dismissed without prejudice.

protected right with respect to Mr. Sewell's mail sent to his family (*id*. at 15-16); Mr. Sewell has not been denied medical care (*id*. at 16-19); revocation of Mr. Sewell's good conduct time was not a violation of due process (*id*. at 19-20); and Mr. Sewell has failed to establish that he has been denied access to courts (*id*. at 20-22). In support of their argument Defendants provide verified documents and declarations that establish the following facts.

Correctional Case Management Specialist Curtis Lawson provides a declaration explaining that Mr. Sewell's rule violation history shows that 1143 good conduct credits were revoked on January 25, 2011, for violation of Rule 205. ECF No. 20-2 at 1; 4. The rule prohibits inmates from refusing to permit an authorized medical test that impacts on public health, security, or a facility. ECF No. 20-2 at 1. Mr. Sewell was charged with violating the rule when he refused to submit to a tuberculosis test. *Id*. at 1; 6-13 (adjustment hearing documents). The mandatory sanction for violating the rule is revocation of all good conduct credits accrued at the time of sentencing. *Id*. at 1. Mr. Sewell subsequently qualified for restoration of the revoked credits and on March 2, 2015, Mr. Sewell's previously revoked credits were restored. *Id*. at 1; 3 (chart indicating 543 good conduct and 570 special project credits restored).

Defendant Warden Armstead states in her declaration that she expects employees at Patuxent to comply with directives and policies regarding inmate housing, security classification, health care, and general prison facility conditions. ECF No. 20-3 at 1 ¶3. In her role as the Warden, she is not involved in the delivery of medical and psychological care provided to inmates and has no authority to make decisions concerning those matters. *Id*. at ¶4. Further, Warden Armstead states she relies on her staff to investigate ARP complaints and to draft a response based on that investigation for her signature. *Id*.

Defendant Director Randall Nero states in his declaration that he does not practice psychology, nor does he render such services to the inmate population; rather, he is an

administrator. ECF No. 20-4 at 1, ¶1. He mirrors Warden Armstead's assertion that he expects employees to abide by directives and policies concerning housing, security classification, health care, and general prison conditions and that he has no involvement in medical care decisions or the provision of medical services. *Id*. at ¶¶ 3 & 4.

Defendant Bezawit Addis asserts that the claim against her should be dismissed as she played no role in whether Mr. Sewell is permitted to hold a job; how or when mail is delivered or processed; whether inmates have meaningful access to the courts; decisions to revoke or restore diminution of confinement credits; or ensuring Mr. Sewell's food is not tainted. ECF No. 25-3 at 1-2, ¶ 3. Rather, Defendant Addis was a mental health professional employed by MHM Services, Inc. and in that capacity worked at Patuxent from April 2016 to August 2018. *Id*. at 1, ¶1. She asserts that she is entitled to judgment in her favor because the complaint does not state an Eighth Amendment claim against her (ECF No. 25-1 at 6-8); there are few if any claims stated that pertain to Defendant Addis (*id*. at 9); and she is entitled to qualified immunity (*id*. at 9-10). In support of her assertion that Mr. Sewell received adequate mental health care, Defendant Addis relies on the verified records submitted with Correctional Defendants' Response to Show Cause (ECF No. 16-2), which were summarized in this court's Memorandum Opinion denying injunctive relief (ECF No. 28 at 4-7.

Defendant Dr. Talibah Buchanan similarly moves for judgment in her favor and states that the majority of Mr. Sewell's claims bear no relation to her role as a psychologist and the conclusory claims regarding the failure to provide Mr. Sewell with appropriate care are belied by verified medical records documenting his extensive care. ECF Nos. 32 and 33. She provides the following summary of Mr. Sewell's psychological care that occurred during her tenure at Patuxent, which ended on September 28, 2018. *See* ECF No. 32-2 (declaration).

On January 26, 2018, during a meeting, Mr. Sewell's treatment team considered increasing Mr. Sewell's "level" but ultimately determined he was not eligible for an increase[11] in light of his recent compliance with medication. The team determined that Mr. Sewell should continue to be encouraged to consider a trial of anti-psychotic medication and individual therapy to help treat his delusional disorder. ECF No. 33 at 59.

On March 7, 2018, Dr. L'Tanya Haith noted that Mr. Sewell was receiving mental health counseling and at some point he was taking Risperdal (anti-psychotic medication), which caused him to have elevated Prolactin levels. At the time of Dr. Haith's notes, Mr. Sewell was not taking psychotropic medications, but had maintained his mood and behavior without them. The plan at that time was to continue to observe Mr. Sewell without psychotropic medication as he denied experiencing hallucinations and, while his speech was grandiose, he was amenable to redirection. ECF No. 33 at 87-93.

On March 22, 2018, psychological associate Bezawit Addis noted that during Mr. Sewell's attendance in treatment and community groups, he focused on how to stop negative thinking, how to replace negative thoughts, and ways to replace negative thoughts with healthy/beneficial thoughts. As a result, Mr. Sewell had significantly reduced his delusional thoughts. ECF No. 33 at 85.

On March 27, 2018, Ms. Addis noted clinical improvement regarding Mr. Sewell's reduction in delusional thoughts. At that time, Mr. Sewell regularly attended treatment and community groups where he was engaged and was an active participant. ECF No. 33 at 84.

On April 2, 2018, Dr. Haith noted that Mr. Sewell was seen in the nursing office where he was expressing concern that his face is "a much darker color than any other part of his body." ECF

---

[11]  Although not explained by the parties, it appears from context that an increase in level is progressive and allows for fewer restrictions, while a decrease in level means more restrictions on the inmate.

No. 33 at 83. He was worried this was an adverse reaction to a medication he was on; at the time Mr. Sewell was not receiving any psychotropic medications but was being evaluated for possible treatment of Type 2 diabetes based on recent lab results. When this was explained to Mr. Sewell, he expressed disbelief that he has Type 2 diabetes. Dr. Haith opined that Mr. Sewell was "able to manage on his tier without psychotropic medication" and would not be prescribed those medications "at this time." *Id.*

Mr. Sewell had an individual psychological session with Ms. Addis on April 4, 2018. ECF No. 33 at 79. Much of Ms. Addis' chart notes discuss group therapy dynamics and describe Mr. Sewell as an active participant with fair insight into his mental health issues but noted incidents where his train of thought revealed delusional content. She provides the example of his belief that his medications caused the pigment on his face to become darker than the rest of his body and states he was encouraged to consider other explanations and to seek out information from medical staff. *Id.*

Mr. Sewell attended a voluntary nursing group therapy session that focused on diabetes warning signs on April 21, 2018. ECF No. 33 at 78. Mr. Sewell is described as participating in the discussion session. *Id.*

Mr. Sewell received individual psychological therapy with Ms. Addis on April 27, 2018, who addressed treatment team concerns about Mr. Sewell's non-compliance with treatment for Type 2 diabetes. Despite having received education regarding the diagnosis and being provided the test results showing an elevated blood sugar level, Mr. Sewell continued to state that he was not diabetic. Ms. Addis noted that Mr. Sewell's thought content reflected delusions and his insight was poor. The plan was to continue to provide Mr. Sewell with accurate information regarding symptoms, causes, and treatment of diabetes with a goal of increasing his insight for his health. ECF No. 33 at 77.

13

On May 4, 2018, Mr. Sewell participated in group therapy, which focused on anger management. ECF No. 33 at 76.

On May 12, 2018, Mr. Sewell attended a voluntary nursing group therapy session that focused on medication education. He is described as an active participant in the discussion session with demonstration of appropriate behavior towards his peers and staff. ECF No. 33 at 75.

On May 17, 2018, psychiatrist Dr. Charles Chong-Hwa Hong assessed Mr. Sewell's capacity to make his own medical decisions and determined that he was unable to do so because of his repeated beliefs that the medication provided to him is not what it is represented to be. ECF No. 33 at 74. Dr. Hong's assessment was in agreement with Dr. Haith's May 10, 2018 assessment. The plan noted was to obtain a surrogate decision maker.[12] *Id.*, *see also id*. at 67 and 70 (May 28 and 29, 2018 chart updates documenting Mr. Sewell's refusal of medication).

On June 12, 2018, Mr. Sewell attended group therapy and is described as demonstrating an "active pattern of participation in a variety of group social and independent leisure pursuits." ECF No. 33 at 64. He is further described as expressing himself in a relevant, goal-directed manner without delusional expression. *Id*.

Mr. Sewell was considered for an emergency level change based on his refusal to take blood pressure medication and receive a diabetes finger stick test on June 25, 2018. When asked by Ms. Addis why he had refused, "Mr. Sewell reported his belief that his medication [has] been tampered with" and explained that "his medication was not being properly secured." ECF No. 33 at 62. Mr. Sewell also stated that he suspected his medication "is being taken out of the medication cart and being switched." *Id*. Despite reassurances and education attempted by medical staff, Mr. Sewell insisted he did not need any medical treatment. *Id*. Additionally, Mr. Sewell expressed his

---

[12] Mr. Sewell's daughter is the surrogate decision maker for his medical care. *See* ECF No. 33 at 65.

belief that his food was being poisoned. *Id.* Based on his fixated delusional thoughts, and his increased agitation when the matters were being discussed, Mr. Sewell's treatment team expressed concern about him remaining in his current high-functioning housing assignment (N4) and notified him he would be moved, a decision approved by his psychiatrist. *Id.* Mr. Sewell expressed anger and said he would be filing a formal complaint "for being persecuted and wrongfully punished." *Id.* Ultimately, Mr. Sewell refused a direct order to lock in his cell, refused any attempts at redirection, and was forcibly removed from the N4 tier. *Id.* Dr. Hong evaluated Mr. Sewell later that day and Mr. Sewell continued to state that his medication had been switched; that it caused him pain; and he cannot trust the food which gave him an ear infection. *Id.* at 61. Dr. Hong's plan included encouragement for Mr. Sewell to try the antipsychotic medication Geodon. *Id.* Mr. Sewell was again encouraged to take Geodon the following day, but again he refused. *Id.* at 60.

On July 30, 2018, Mr. Sewell told Dr. Hong that he needed to be treated fairly and lamented that there was a long list of people trying to extort money from him; people were interfering with his release; and everywhere he went he was put on attack. ECF No. 33 at 58. Mr. Sewell denied being delusional and denied paranoid ideation related to his food. *Id.* When Dr. Hong suggested a trial of Geodon, Mr. Sewell refused because he had too many bad experiences with medications. *Id.*

On August 22, 2018, Mr. Sewell attended a group therapy session with eight other inmates during which the topic of gas and gas pain was discussed with the focus being on medical education. ECF No. 33 at 57.

On August 24, 2018, Mr. Sewell attended stress management group therapy and another session focusing on coping with emotions. ECF No. 33 at 55-56.

On August 31, 2018, Mr. Sewell attended a group therapy session focusing on ways to prevent and control high blood pressure. ECF No. 33 at 53.

15

On September 20, 2018, Mr. Sewell received an individual therapy session with Kaylin Honchar during which he revealed that a close family friend had passed away. Ms. Honchar recommended that Mr. Sewell could write a letter saying goodbye to his friend and encouraged him to talk to the nurses if he needed to talk to someone. ECF No. 33 at 51. Mr. Sewell expressed some concern about reaching out to the nurses due to information not remaining private in the housing unit. *Id*.

On September 27, 2018, when Mr. Sewell was seen again by Ms. Honchar, he was provided with grief worksheets that he had requested the prior week and shared that he was still working on the stages of his grief. ECF No. 33 at 50. Shortly thereafter, Ms. Addis and Dr. Buchanan left their employment at Patuxent.

## **STANDARD OF REVIEW**

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in

16

her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 645 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## ANALYSIS

The precise nature of Mr. Sewell's claims are difficult to discern; however, it is clear he is disgruntled by the manner in which his administrative complaints are handled and he is firm in his beliefs that the medical care he is provided is not appropriate; the psychological care he is offered is inadequate; and that he is the target of mail tampering which impacts his ability to contact this court and his family.

His claims as to the Correctional Defendants center around their roles as supervisory personnel at Patuxent and their alleged failure to enforce existing policies and regulations. Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the

particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Mr. Sewell asserts in his opposition that there is a genuine dispute of material fact concerning compliance with "the Commissioner's own regulations." ECF No. 22 at 2, citing DPSCS Directives 124-510 and 130-100, § 172. In this context, Mr. Sewell discusses his move from one tier to another where his movement is restricted and where alleged gang members are housed. ECF No. 22 at 2. He describes the conditions of his housing unit as being on lockdown 24 hours a day with no morning activities and claims nobody checks on the mental health inmates housed there.[13] *Id.* The claims, even if they had been made against correctional staff directly involved in the conditions alleged, do not state a constitutional claim.

It is well established that prisoners do not have a constitutional right to access programs or to demand to be housed in one prison verses another, absent a showing of significant hardship. "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976), s*ee also Sandin v. Conner*, 515 U.S. 472, 493 (1995), requiring an atypical and significant hardship as prerequisite to creation of a constitutionally protected liberty interest.

Although Mr. Sewell disagrees with the decision to move him to a different, more restrictive housing unit, the verified records establish that there was in fact a legitimate, non-discriminatory reason for the decision. *See* ECF No. 33 at 62 (describing incident prompting his move). It is not the role of federal courts to scrutinize and overturn decisions made by prison staff

---

[13]   Mr. Sewell's claim that no staff check on mental health inmates in his housing unit are belied by the numerous record entries memorializing regular contact with both medical and psychology staff. *See* ECF No. 33.

who are in a better position to discern the appropriate measures to take. *See Sandin*, 515 U.S. at 482-83. The conditions Mr. Sewell describes, while harsh, do not fall within the ambit of cruel and unusual punishment proscribed by the Eighth Amendment. Further, this court notes that injunctive relief has been denied in this case based on the evidence refuting Mr. Sewell's dire descriptions of alleged threats to his safety, poisoning of his food, and tampering with his medication. *See* ECF No. 16 (Response to Show Cause with exhibits).

Mr. Sewell also asserts that he is illegally incarcerated and appears to assert that he either should have had all good conduct credits restored, but they were not; or he is entitled to additional diminution of confinement credits that have not been awarded. In his opposition he repeats his claim that "Patuxent staff [are] tampering and using misrepresentation of rights to hinder my release" and asserts that they are "purposely refusing to properly calculate my sentence." ECF No. 22 at 4. In addition, Mr. Sewell references the habeas corpus petition he filed in this court concerning the same issue. *Id.* at 1, *see also Sewell v. Corcoran*, Civil Action DKC-18-2726 (D. Md. 2018).

As Correctional Defendants correctly note, any allegation that Mr. Sewell's good conduct credits were wrongfully revoked in 2011 is time-barred. ECF No. 20-1 at 8-9. "Section 1983 provides a federal cause of action, but in several respects relevant here, federal law looks to the law of the State in which the cause of action arose. This is so for the length of the statute of limitations: it is that which the State provides for personal-injury torts." *Wallace v. Kato*, 549 U.S. 384, 387 (2007) (citing *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)). In Maryland, the applicable statute of limitations is three years from the date of the occurrence. *See* Md. Code Ann., Cts & Jud. Pro. § 5-101. Moreover, Mr. Sewell's revoked credits have been restored. *See* ECF No. 20-2 at 1 & 3.

To the extent that Mr. Sewell is claiming that he was denied access to courts because his legal mail did not reach this court and his petition for writ of habeas corpus was therefore dismissed (*see* ECF No. 22 at 1, noting injury as dismissal of Civil Action DKC-18-2726), the claim has no merit. First, Mr. Sewell's Petition for Writ of Habeas Corpus was dismissed by this court shortly after his supplemental petition[14] was received. *See Sewell*, Civil Action DKC-18-2726 at ECF No. 3 (supplemental petition received Sept. 26, 2018) and ECF No. 5&6 (Memorandum Opinion and Order dated Oct. 10, 2018). Secondly, the petition was dismissed because Mr. Sewell's claim was without merit. A meritorious access to courts claim must demonstrate an actual injury to "the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Lewis v. Casey*, 518 U.S. 343, 355 (1996). An actual injury occurs when a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts. *Id.* at 399. Here, Mr. Sewell's argument that the disciplinary rules governing inmate behavior were without any force or effect due to a violation of Maryland's Administrative Procedure Act was specifically rejected by the Maryland Court of Appeals in *Massey v. Secretary*, 389 Md. 496, 500 (2005). Mr. Sewell's claim that he has been denied access to courts must be dismissed.

Mr. Sewell also takes issue with Correctional Defendants' manner of processing his ARP complaints and repeatedly states that there are no signatures on the complaints returned to him, nor are there any responses. ECF No. 22 at 3. The ARP complaints submitted by Mr. Sewell with his complaint and with his opposition include numerous claims that are difficult to follow. ECF No. 1 at 41-42; ECF No. 1-1 at 16-47; ECF No. 22-1 at 1-4. Frequently, as is demonstrated on the ARPs Mr. Sewell includes with pleadings in this case, his complaints are returned with instructions

---

[14] Mr. Sewell complained to prison officials that a pleading he sent to this court which was docketed on September 24, 2018, did not include all of the attachments he sent with it. ECF No. 22-1 at 10-12. The docket in Civil Action DKC-18-2726 reflects that Mr. Sewell's supplemental petition included five attachments.

to resubmit with a single issue raised. When Mr. Sewell does not comply with those directives, his ARP is dismissed. To the extent that Mr. Sewell is claiming that "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation" *Ross v. Blake*, 136 S. Ct. 1850, 1860 (2016), thereby making administrative remedies unavailable to him for purposes of exhaustion of administrative remedies, those actions do not give rise to an independent cause of action. Rather, exhaustion of administrative remedies is an affirmative defense which can be rebutted through demonstration that administrative remedies are unavailable. *Id*. at 1859. On the record currently before the court, there is no evidence that administrative remedies have been made unavailable to Mr. Sewell. *See Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006) (exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines."). For these reasons, Correctional Defendants' motion, which is construed as one for summary judgment, will be granted.

Defendants Bezawit Addis and Dr. Buchanan are also entitled to judgment in their favor as Mr. Sewell has failed to demonstrate that either of these two defendants have acted to deprive him of his constitutionally protected rights, nor does the record support a claim that Mr. Sewell's medical and psychological needs have been ignored. Both Defendants Addis and Buchanan state in their declarations that in their roles as employees of the mental healthcare provider at Patuxent they had no authority to determine whether Mr. Sewell would be assigned an institutional job; had no role to play in the delivery or retrieval of mail or ensuring Mr. Sewell had access to courts; nor could they determine whether Mr. Sewell was entitled to diminution of confinement credits; or control the quality of Mr. Sewell's food. ECF No. 25-3 at ¶3 (Addis Declaration); ECF No. 32-3 at ¶3 (Buchanan Declaration). At most, Defendants Addis and Buchanan made determinations

regarding mental health stability for purposes of job assignments and made recommendations regarding activities with other inmates based on that same stability. *Id.*

In his opposition, Mr. Sewell asserts that Ms. Addis "purposefully refused to allow [him] to work" and claims other inmates who were assigned to segregation were allowed to work. ECF No. 27 at 1. He blames Ms. Addis because she informed him that he needed a health evaluation before he could be considered for a job and after he obtained medical clearance, he still was not given a job assignment. *Id.* at 1-2. Mr. Sewell also faults Ms. Addis, along with Dr. Haight, for moving him to a more restrictive housing unit and leaving him there without reason. *Id.* at 2. In Mr. Sewell's view, their opinion that he is delusional was not a sufficient reason to move him to a different housing unit. *Id.* He further claims that he was ultimately removed from that housing status by the Regional Mental Health Director, Ms. Powell, after he showed her proof that his sentence is expired. *Id.* at 3.

Mr. Sewell's disagreement with his diagnosis and the decisions made in light of it does not establish a basis for a violation of his due process rights or the Eighth Amendment. "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)); *accord Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) ("[W]e consistently have found such disagreements to fall short of showing deliberate indifference."). There is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977); *see also DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) ("Courts treat an inmate's mental health claims just as seriously as any physical health claims."). Here, Mr. Sewell has been diagnosed with delusional disorder and has been offered medications to treat the disorder repeatedly, but he has consistently refused to

cooperate with treatment. When the content of his beliefs were challenged and he became agitated with staff, he was moved to more restrictive housing. The due process clause of the Fourteenth Amendment and the cruel and unusual punishments clause of the Eighth Amendment do not prohibit that course of action. Again, it is not the province of this court to make determinations that are better left to the expertise of staff dealing with the day to day operations of the mental health tiers at Patuxent. The right to psychiatric care is based upon the essential test of medical necessity and not upon that care considered merely desirable. *Id.* at 48. To the extent that Patuxent's regulations require more, the claim does not raise a federal question.

Similarly, Mr. Sewell's claims that his medical care has not been appropriate based on a perceived failure to address the symptoms he attributes to side-effects do not state an Eighth Amendment claim. Efforts to explain to Mr. Sewell that the symptoms he describes are not within the purview of side-effects for the medications he is given (*e.g.*, aspirin) have failed to disabuse him of his beliefs. To the extent he chooses to disagree with medically trained staff, which he is free to do, their failure to agree with Mr. Sewell's assessment and act on it is not deliberate indifference to a serious medical need. Such a claim must be supported by some evidence of an objective, serious medical need. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017) (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious

medical need).[15]  Mr. Sewell's claimed conditions do not constitute an objectively serious medical need.

## CONCLUSION

In light of the record evidence, including exhibits submitted by all parties, the court finds that Defendants are entitled to summary judgment in their favor on all claims raised.  With regard to the Defendants who were never served with the complaint, Dr. Haight and Dr. Allen, the court dismisses the claims without prejudice.  By separate Order which follows, the pending dispositive motions will be granted and the case closed.

February 10, 2020                                    _____/s/_____
                                                     DEBORAH K. CHASANOW
                                                     United States District Judge

---

[15]  Ironically, Mr. Sewell has been diagnosed with serious medical conditions (hypertension and diabetes), but he has refused the treatment offered by medical staff.